**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No.  18-cr-00381-CMA-GPG

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  BRUCE HOLDER,

     Defendant.

---

**GOVERNMENT'S SENTENCING STATEMENT**

---

In accordance with District Court of Colorado Local Rule 32.1(a)(1), the government hereby submits this statement to address the sentencing factors in Title 18, United States Code, Section 3553(a), as applied to this case.  The government contends that the appropriate sentence in this case is a lifetime of imprisonment.  The Court should also order the defendant to pay restitution as permitted by law.  In support thereof, the government states as follows:

I.  BACKGROUND

Although the Court presided over trial, the government states below the general facts established at trial:

Beginning in approximately 2016, the defendant, in conjunction with a source of supply in Mexico, began importing small blue pills bearing identifying marks consistent with 30 mg Oxycodone pills manufactured by Mallinckrodt, Inc.  In reality, these pills were counterfeit; they were not produced by Mallinckrodt, Inc. and they contained

fentanyl instead of Oxycodone.   At the defendant's direction, his wife, Marie Matos, would frequently travel to Mexico and transport pills back to the Grand Junction area. Additionally, on multiple occasions the defendant would also personally travel to Mexico to obtain thousands of these pills.

Ms. Matos testified that in 2017 through 2018, she or the defendant would travel to Mexico approximately every two weeks.   She estimated that they would return with approximately 2000 pills each trip.   Based on this, she agreed that they had imported approximately 52,000 pills during a single year.   Ms. Matos explained that she and the defendant, as well as multiple other co-conspirators, distributed these pills to numerous customers.   The defendant obtained the pills for approximately $12 per pill and sold the pills for between $20 and $30, or more, per pill.   Based on conversations with the defendant, Ms. Matos explained that the defendant knew the pills contained fentanyl and were counterfeit.   Indeed, eventually the defendant began directing his customers to cut pills in half or quarters because of the potent nature of the fentanyl.

Ms. Matos identified the defendant's children, her cousin, and numerous others as co-conspirators assisting with the distribution of these pills in the Grand Junction area.   Ms. Matos was clear that the defendant was the "boss" when it came to distributing these pills.   Ms. Matos also explained that the defendant directed her, following his arrest, to destroy evidence by attempting to remotely wipe devices seized by law enforcement.   Finally, Ms. Matos described her receipt of additional pills in January 2019 from the source of supply in Mexico, and her subsequent arrest.

2

Christopher Huggett, Ms. Matos's cousin and a family friend of the defendant, testified that he distributed the counterfeit pills containing fentanyl in conjunction with the defendant and others.   He described a specific transaction in December of 2017 in which he obtained pills directly from the defendant and distributed them to a friend, Mr. Green.   He later learned that Mr. Green had potentially overdosed and that another person, J.E., had died after getting some of the pills from Mr. Green.   Mr. Huggett informed the defendant of this incident.   Despite learning of this death, they continued to distribute the counterfeit pills.

In approximately February of 2018, after learning of the death discussed above, the defendant took Mr. Huggett and his son to Mexico.   Once there, Mr. Huggett saw the defendant provide a large wad of cash to an individual the defendant had stated was the source of supply for these counterfeit pills.   After spending a few days in Mexico they returned, crossing the border with pills hidden in the vehicle.   After they had returned to Grand Junction, Mr. Huggett later saw the defendant with multiple vacuum-sealed bags containing approximately 1000 pills each.   Mr. Huggett explained that he had been aware of trips by the defendant to Mexico approximately once a month and had seen the defendant with around 3000-5000 pills in similar bags after several of these trips.

Finally, Mr. Huggett admitted that he had solicited individuals in jails to harm Mr. Green.   He also testified that the defendant was aware of these efforts and had discussed how they would both benefit if Mr. Green was gone.   During this

conversation, someone commented, "no face, no case," regarding Mr. Green's death.

Mr. Green also testified, explaining that he had received counterfeit pills containing fentanyl from Mr. Huggett and had distributed some of those pills to J.E. in December 2017.   The evidence at trial established that J.E. was later found at his home deceased.   The cause of J.E.'s death was fentanyl and counterfeit pills found in J.E.'s room contained fentanyl.   Based on the evidence, the jury concluded beyond a reasonable doubt that the defendant had distributed fentanyl, the use of which resulted in J.E.'s death (Count 2).   The jury also concluded that the defendant had distributed a counterfeit substance in connection with this chain of distribution (Count 4).

In addition to these matters, Mr. Green testified that he had also used some of the pills he received from Mr. Huggett in December 2017.   Shortly after using one of these pills, he lost consciousness.   The evidence at trial established that Mr. Green was found by a co-worker, resuscitated and later taken to a hospital.   While Mr. Green's diagnosis did not include an overdose, it is notable that the hospital staff did not actually test Mr. Green for fentanyl.   At trial, the government argued that Mr. Green suffered serious bodily injury because he had stopped breathing and had no pulse after using one of the counterfeit pills containing fentanyl.   Although the jury concluded the defendant was guilty for distributing fentanyl in connection with this incident, it indicated that there was reasonable doubt as to the sentence enhancer regarding whether Mr. Green suffered serious bodily injury as a result of using that fentanyl (Count 3). Nevertheless, this Court may consider these circumstances in evaluating a sentence in

4

this matter.   18 U.S.C. § 3661; *see also United States v. Watts*, 519 U.S. 148, 157 (1997) ("acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence").

In addition to others, the defendant's children also testified at the trial.   The defendant's daughter, Lexus Holder, described how she distributed counterfeit pills in conjunction with her father.   She explained that she began distributing to a customer that her father established and that she also developed her own customer base.   She also testified that she distributed counterfeit pills, obtained from her father, to Jonathan Kees; the evidence established that Mr. Kees ultimately sold some of those pills to a person working with the DEA.

The defendant's step-daughter, W.G., similarly testified that she was encouraged by the defendant to become involved in distributing the counterfeit pills.   Initially, she began obtaining pills from the defendant to support her ex-husband's drug habit.   She also testified that she later developed some customers of her own and supplied them using pills obtained from the defendant.

The defendant's son, T.H., explained that he began dealing drugs with the defendant when he was still in high school.   As a minor, T.H. distributed counterfeit pills supplied by the defendant to customers the defendant directed him to, and later to customers he developed on his own.   The evidence detailed text communications between the defendant and his son where they explicitly discussed their drug dealing

5

business.

A couple customers and close friends of the defendant, G.B. and C.B., also testified.   They discussed the large quantity of pills they obtained from the defendant, primarily to support their own addiction, as well as how they facilitated others in obtaining pills from the defendant.   G.B. also described an incident in which his wife, C.B., overdosed on these pills, and the defendant's reaction when informed of this.

Finally, DEA Special Agent Doheny testified regarding the investigation.   In particular, Agent Doheny identified the voluminous evidence that was obtained from the defendant's phone, including messages between the defendant and his source of supply in Mexico.   The messages between the defendant and the source of supply detailed the ongoing distribution of thousands of counterfeit pills containing fentanyl.

Based on all of the evidence, the jury concluded that the defendant had conspired with others to distribute fentanyl and counterfeit substances (Count 1).   The jury also concluded that the defendant was accountable for 400 grams or more of fentanyl as part of his conduct in this conspiracy.

<u>Additional Relevant Conduct</u>

During the investigation, the government discovered additional criminal activity that is relevant to this Court's determination of a sentence in this matter.   Although not presented at trial, this Court is free to consider the evidence in making its sentencing determination.   18 U.S.C. § 3661.   The government has detailed this additional relevant conduct below.

1.　　<u>Other Controlled Substances</u>

The defendant was engaged in distributing several additional controlled substances during the criminal activities charged in this case. For example, Ms. Matos explained that they began importing methamphetamine obtained from their source of supply in Mexico prior to beginning to distribute pills. At the peak of their distribution activities, when they were bringing in approximately 2000 pills a trip, Ms. Matos estimated they were also importing approximately 15 pounds of methamphetamine per trip. Ms. Matos described the location where the pills and methamphetamine were hidden in the dash of her vehicle (the same location described at trial). When agents examined that location, they discovered approximately an ounce of methamphetamine that had fallen into a lower panel in the dash, corroborating Ms. Matos's statements.

Similarly, both Ms. Matos and the defendant's ex-wife, explained that the defendant obtained pills from a neighbor and distributed them. They described these pills as looking different from the counterfeit pills the defendant obtained from Mexico and said that they were Percocets. They explained that the defendant would provide the neighbor with marijuana in exchange for her entire prescription each month. Both Ms. Matos and the defendant's ex-wife said this was the point at which the defendant's primary source of income began to transition from methamphetamine to pills.

Finally, the defendant agreed with his source of supply to facilitate the distribution of heroin. In approximately February 2018, the source of supply sent the defendant a video of two planes taking off from a remote landing strip somewhere in Mexico.

7

Shortly thereafter, the source of supply sent several videos and photos depicting large fields of poppy flowers.   Accompanying these were voice messages stating the source of supply was looking at the fields and that they (ostensibly referring to the defendant and the source of supply) were going to make a lot of money.   This appeared to be a reference to a plan to manufacture heroin, which is derived from poppy plants.

In August 2018, the defendant and the source of supply exchanged text messages about whether they were going to go with the "white and black," which again appeared to be a reference to manufacturing heroin.   A few days later, the source of supply informed the defendant that he would "start working on H."   In response, the defendant told the source of supply that there was a person "out of Salt Lake" that the defendant would introduce to the source of supply.   The defendant then agreed to be a "middle man" to see how the guy does, and that the deal would involve "one white [and] one black."   This appeared to be an agreement to distribute a kilogram (or some other quantity) each of "black tar" and powdered "white" heroin.   The two agreed that "big man" (identified at trial as a co-conspirator) would deliver the heroin to the defendant on August 23, 2018.   However, the defendant was arrested in this case on August 21, 2018.   As a result, the deal could not take place.

2.   Receipt and possession of firearms

During the investigation, agents also learned that the defendant obtained firearms in exchange for counterfeit pills.   Agents discovered multiple photos of firearms on the defendant's phone.   The defendant had sent some of these photos to

C.B., a customer of his (who testified at trial).   C.B. was later interviewed and confirmed that she had purchased the firearms depicted in the photos at the defendant's direction, because he was a felon and could not purchase them himself.   C.B. explained that she provided these firearms to the defendant in exchange for a reduction of her drug debt, which had accrued from the purchase of counterfeit pills from the defendant.   Ms. Matos recognized at least one of these firearms as having been hidden in the door of her vehicle by the defendant and smuggled into Mexico.   She explained that these firearms were provided to their source of supply in Mexico, and that she believed they were used as bribes to facilitate their drug trafficking activities.

      3.    <u>Attempted Contact with Witnesses</u>

Shortly before trial, the government received notification that the defendant had contacted or attempted to contact individuals associated with Ms. Matos.   It was reported that the defendant had called Ms. Matos's son and one of her close friends. The government contacted these individuals.

Ms. Matos's son, who is still a juvenile, reported that the defendant attempted to call him, but that they did not actually speak.   Ms. Matos's son rejected the call when he realized it was from the defendant.   Nevertheless, he stated that the mere fact the defendant knew how to contact him caused him fear and concern; he explained that his contact information had changed since the defendant's arrest.   In addition, Ms. Matos's son was worried that the defendant could attempt to have others locate him.   Ms. Matos's son said that he reported this attempted contact to his mother.

9

The government also spoke with a close friend of Ms. Matos.   She stated that the defendant contacted her, and that they had never spoken on the phone before. She explained that they spoke for some time during the call and that it appeared to her that the defendant was attempting to get her to pass messages to Ms. Matos in an effort to either discourage her from testifying or to alter her testimony.   The friend stated that she did not contact Ms. Matos or pass along the defendant's messages, instead she reached out to Ms. Matos's attorney and eventually spoke with the government.

4.   Additional Overdoses

During the course of the conspiracy, the defendant was informed on numerous occasions about the dangerous effects that the pills he was distributing were causing. Some examples of this were described at trial.   For example, G.B. informed the defendant of his wife's overdose.   Similarly, the defendant was informed of J.E.'s death.   In addition to those described at trial, there were numerous other instances where the defendant learned of the dangerous effects of the pills he was distributing. The defendant's ex-wife informed him that she had overdosed on one of these pills. The defendant was also aware of several other deaths that had occurred.   Despite his awareness of the lethal consequences of these pills, the defendant continued to import and distribute tens of thousands of pills.

The government has identified numerous individuals who died after receiving pills believed to have been supplied by the defendant.   While many of these deaths may not support a separate charge, and were not introduced at trial, the government believes

that it is important for the Court to be aware of the impact the defendant's actions have had on the community, and the following individuals and their families in particular.

T.C.

In May 2018, T.C. (a/k/a T.H.) was discovered in his room unresponsive. Emergency personnel were dispatched and attempted to resuscitate him, but they were unsuccessful.   Later, from a box found in T.C.'s room, law enforcement obtained a small baggie with distinctive penguin logos that had counterfeit pills containing fentanyl inside.   This baggie matched other baggies discovered in the defendant's home at the time of his arrest.   Numerous co-conspirators, including Ms. Matos, confirmed that these baggies were used by the defendant to package the counterfeit pills he distributed.

An autopsy performed on T.C. showed that multiple substances all contributed to his death.   Although fentanyl was not the sole cause, fentanyl is listed as one of the substances that contributed to T.C.'s death.

T.C was a childhood friend of the defendant's son and was well known by many of the co-conspirators.   Numerous co-conspirators, as well as text messages obtained from the defendant's and T.C.'s phones, confirmed that the defendant supplied T.C. with counterfeit pills.   Indeed, Ms. Matos explained that T.C. visited the defendant the day before his death to obtain fentanyl pills.   In addition to using the pills himself, evidence developed during the investigation established that T.C. worked with the defendant to distribute counterfeit pills containing fentanyl to several individuals,

11

including B.H. and D.A. discussed below.

B.H.

In July 2017, B.H. (who was 18 years old at the time) was found deceased in his home.   During an interview, T.C.'s grandparents reported that B.H. and T.C. were together the evening before B.H.'s death.   They also stated that B.H. had been so intoxicated that T.C. had to help B.H. into his home, where he was left for the evening. B.H. was discovered deceased the following day.   An autopsy performed on B.H. showed that the cause of his death was a combination of fentanyl and oxycodone intoxication.   Although fentanyl was not the sole cause of B.H.'s death, it clearly contributed to this death.

As referenced above, evidence obtained from T.C.'s phone indicates that T.C. was B.H.'s source of supply for counterfeit pills containing fentanyl.   And, as stated, T.C. obtained the pills he distributed from the defendant.

D.A.

In September 2017, D.A. was found deceased in a friend's home.   A review of both his and T.C.'s phones showed that, on the day prior to D.A.'s death, they had negotiated a transaction involving counterfeit pills containing fentanyl.   D.A. purchased several pills from T.C., which T.C. had previously obtained from the defendant.   An autopsy performed on D.A. showed that his cause of death was fentanyl intoxication. While never charged in this case, D.A.'s death has been charged in a separate companion case against the defendant's source of supply and others.

<u>W.M.</u>

In March 2017, W.M. was discovered deceased by his roommate in Jackson County, CO.   At the scene of his death, officers discovered small blue pills containing markings consistent with pills distributed by the defendant.   It does not appear that these pills were ever collected or tested.   However, an autopsy performed on W.M. determined that his cause of death was fentanyl intoxication.

During an interview with law enforcement, Ms. Matos explained that G.B. (who testified at trial in this matter) had informed the defendant of a death involving circumstances identical to W.M.'s death.   A confidential source of information ("SOI") developed during the investigation also corroborated this information, and explained her understanding of the chain of distribution beginning with the defendant and ultimately flowing to W.M.

<u>C.C.</u>

In February 2018, C.C. was found deceased in her home.   The SOI discussed above informed agents when coming forward that she believed she may have been involved in the chain of distribution resulting in C.C.'s death.   The SOI stated that she obtained counterfeit pills from the defendant in conjunction with C.B. (who testified at trial).   The SOI then distributed these pills to another individual who she believed ultimately distributed the pills to C.C. and others.   An autopsy performed on C.C. showed that fentanyl and alcohol intoxication resulted in her death.   Although fentanyl was not the sole cause of C.C's death, it clearly contributed to that death.

C.H.

In July 2017, C.H. was found deceased in the driveway of a home.   The owner of the home found C.H. after their doorbell was rung and they answered the door.   While opening the door, the owner saw a vehicle speed away.   Although law enforcement was unable to definitively identify the driver of this vehicle, it is believed to be an individual who was later observed purchasing counterfeit pills from Mr. Kees during surveillance activities.   As discussed at trial, agents conducted controlled purchases of counterfeit pills containing fentanyl from Mr. Kees during the investigation.   The defendant's daughter testified that she supplied Mr. Kees with pills and that she obtained these pills from the defendant.

An autopsy performed on C.H. showed that a combination of fentanyl and alcohol caused his death.   Although fentanyl was not the sole cause of C.H.'s death, it is listed as one of the substances that contributed to this death.

C.A.

In November 2017, C.A. was found unresponsive in her home.   She was transported to the hospital and later pronounced dead.   An autopsy performed on C.A. revealed that a combination of fentanyl and methamphetamine intoxication caused her death.   Although the source of these controlled substances is less clear, it is noteworthy that C.A's husband was a known associated of G.B. (who testified at trial and admitted to facilitating distributions of fentanyl pills from the defendant). Accordingly, the defendant is a likely source for the fentanyl (and potentially the

14

methamphetamine) that resulted in C.A.'s death.

A.R.

In June 2018, A.R. was found unresponsive in a vehicle in front of her home. Her boyfriend, J.A., was also found unresponsive in the vehicle.   Emergency personnel attempted to resuscitate both of them.   J.A. was revived after being administered naloxone, but A.R. did not recover.   An autopsy performed on her showed that a combination of fentanyl, cocaine, and alcohol caused her death.   Although fentanyl was not the sole cause of her death, it contributed to this death.

During a search of the home, officers located several small blue pills consistent with those distributed by the defendant.   These pills were later tested and confirmed to contain fentanyl.

During an interview at the hospital, J.A. reported that A.R. lost consciousness after snorting a portion of one of the blue pills found in the home.   He also reported that he obtained the pills from Jessica Brady.   Shortly after being released from the hospital, J.A. committed suicide.

Investigators contacted Ms. Brady.   Ultimately, she admitted to distributing counterfeit pills containing fentanyl to J.A. that she had obtained from co-defendant Geri Bochmann.   Ms. Bochmann similarly admitted to distributing the pills to Ms. Brady, and identified co-defendant Corina Holder as the source of these pills.   Corina Holder, prior to her death, admitted to distributing pills in conjunction with the defendant for an extended period.   She also admitted that, in relation to the particular chain of

distribution that culminated in A.R.'s death, she had received the pills directly from her daughter Lexus Holder after they had been dropped off to Lexus by the defendant. Lexus Holder corroborated this information in a separate interview.

As this Court is aware, this incident was originally charged in this matter. However, in the interests of seeking a more efficient presentation at trial, the government dismissed substantive charges related to this incident against this defendant.   Although this incident and the others discussed above were not specifically charged or discussed at trial, the government maintains that fentanyl distributed by the defendant contributed to each of these deaths.

## II.    GUIDELINE CALCULATION

Among the factors the Court must consider in sentencing the defendant is the sentencing range recommended by the Sentencing Guidelines.   18 U.S.C. § 3553(a). The government believes the appropriate guideline calculation here leads to a recommended sentence of life imprisonment.

The jury found the defendant guilty of one count of conspiracy to distribute or possess with intent to distribute fentanyl and counterfeit substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), (2), and (b)(1)(A)(vi); two counts of distribution of fentanyl, in violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C) (for one count the jury found that use of fentanyl distributed by the defendant resulted in the death of J.E., enhancing the sentence); and one count of distribution of a counterfeit substance, in violation of Title 21, United States Code,

16

Section 841(a)(2) and (b)(1)(C).   As an initial matter, the government believes that Counts 3 and 4 should merge into Count 2 for the purposes of sentencing because these counts all relate to the same mixture or substance involved in the same chain of distribution.   Additionally, for the purposes of the guidelines, it appears that all of the Counts would group into a single offense level.   U.S.S.G. § 3D1.2(d).

Here, the appropriate guideline of the U.S. Sentencing Guidelines Manual is Section 2D1.1.   Under that section, the base offense level is 38.   U.S.S.G. § 2D1.1(a)(2).

There are several specific offense characteristics that apply to this defendant. First, as discussed above, the defendant directed the purchase of firearms and received them in exchange for controlled substances.   He later smuggled these firearms into Mexico and provided them to his source of supply so that they could be used as bribes to further their on-going drug conspiracy.   Accordingly, the defendant possessed a weapon in connection with the offense.   Under such circumstances, the guidelines direct a two-level increase in the offense level.   U.S.S.G. § 2D1.1(b)(1).   The resulting adjusted offense level at this point would be 40.

Next, as Mr. Huggett testified at trial, the defendant was aware of and supported Mr. Huggett's efforts to solicit Mr. Green's murder.   Similarly, as Ms. Matos testified the defendant made implied threats and intimidated her during the conspiracy.   As such, the defendant made a credible threat to use violence or directed the use of violence. Consequently, the guidelines impose a two-level increase in the offense level.

17

U.S.S.G. § 2D1.1(b)(2).   The resulting adjusted offense level at this point would be 42.

As discussed above, the defendant's relevant conduct involves the importation of methamphetamine that the defendant knew was imported unlawfully.   Therefore, there is an additional two-level increase in the offense level.   U.S.S.G. § 2D1.1(b)(5).   The resulting adjusted offense level at this point would be 44.

The evidence at trial established that the defendant distributed tens of thousands of counterfeit pills containing fentanyl from his home, that he used his home to store these controlled substances and the resulting drug proceeds, and that he conducted a significant portion of his drug-related activities from his home.   Accordingly, the defendant maintained a premises for the purpose of distributing a controlled substance, and the guidelines direct a two-level increase in the offense level.   U.S.S.G. § 2D1.1(b)(12).   The resulting adjusted offense level at this point would be 46.

The record is also replete with evidence establishing that the defendant knowingly distributed pills with identifying marks indicating they were 30mg Oxycodone pills manufactured by Mallinckrodt, Inc.   The evidence also clearly established that the defendant knew these pills were counterfeit and that they actually contained fentanyl. Accordingly, the defendant knowingly marketed fentanyl as another substance. Indeed, several witnesses stated that they initially believed the counterfeit pills were Oxycodone based on the identifying marks.   Thus, the guidelines impose a four-level increase in the offense level.   U.S.S.G. § 2D1.1(b)(13).   The resulting adjusted offense level at this point would be 50.

Finally, the evidence at trial showed that the defendant was directly involved in importing the counterfeit pills from Mexico into the United States.   And, as discussed below, the defendant held an aggravating role in this criminal activity.   Accordingly, the guidelines direct a two-level increase in offense level.   U.S.S.G. § 2D1.1(b)(16)(C).[1] The resulting adjusted offense level at this point would be 52.

There are also some adjustments that apply to this matter.   First, as referenced above, the defendant held an aggravated role in the criminal activity.   Indeed, the evidence showed that the defendant was the primary organizer and leader of the distribution activities in the Grand Junction area.   This criminal activity involved Ms. Matos, Lexus Holder, Corina Holder, Mr. Huggett, the defendant's son, and several others; there were well over five participants.   Consequently, the guidelines impose a four-level increase in the offense level.   U.S.S.G. § 3B1.1(a).   The resulting adjusted offense level at this point would be 56.

Next, the evidence at trial established that the defendant involved his minor son in the distribution of fentanyl while his son was still in high school.   Accordingly, to the extent this conduct is not already incorporated, the guidelines direct a two-level increase

---

[1] The government notes there are several other factors under this guideline that could also support this enhancement.   For example, the defendant knowingly involved his minor son in the distribution of fentanyl.   U.S.S.G. § 2D1.1(b)(16)(C).   The defendant may have engaged in witness intimidation or obstructed justice.   U.S.S.G. §2 D1.1(b)(16)(D).   And, the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood.   U.S.S.G. § 2D1.1(b)(16)(E).   Because this enhancement requires only one factor, and because these factors may be applicable for other adjustments, the government has referenced only the enhancement appliable under U.S.S.G. § 2D1.1(b)(16)(C).

in the offense level.   U.S.S.G. § 3B1.4.   The adjusted offense level at this point would be 58.

Finally, the defendant attempted to obstruct or impede the administration of justice with respect to this investigation and prosecution and the obstructive conduct related to the defendant's offense of conviction and relevant conduct.   Indeed, the defendant instructed Ms. Matos to destroy evidence, supported efforts to have Mr. Green murdered, and attempted to sway Ms. Matos's testimony by contacting people connected with her.   Accordingly, to the extent this conduct is not already accounted for, the guidelines impose a two-level increase in the offense level.   U.S.S.G. § 3C1.1.

With all of these considerations, the government calculates the total adjusted offense level as 60.   While the government is aware that the defendant has prior criminal convictions, it is unclear whether those offenses would result in any criminal history points under the guidelines.   Nevertheless, the total adjusted offense level far exceeds the maximum offense level considered by the guidelines.   Accordingly, the defendant's criminal history category would have no impact on the guideline recommendation (nor does it meaningfully impact the government's recommendation in this matter).   Even assuming the lowest criminal history category, the recommended guideline range applicable to this defendant is a lifetime sentence of imprisonment. The guidelines would also recommend a fine range of $50,000 to $10,000,000, U.S.S.G. § 5E1.2, and a period of supervised release, based on the mandatory minimum applicable period, of five years.   U.S.S.G. §5D1.2(c).

### III.    OTHER 3553(A) FACTORS

In addition to the guideline calculation, the Court must also consider other statutory factors.   These include, as applicable here, the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes by the defendant.   18 U.S.C. § 3553(a).   These factors all support a sentence of life imprisonment.

Here, the defendant has been previously convicted of drug trafficking offenses and sentenced to prison.   This prior criminal history did little to deter the defendant. Instead, not only did the defendant reengage in similar criminal conduct, but he recruited his entire family, including his minor son, to participate in his criminal endeavor.   Each of the participants will now face likely significant consequences for, in large part, following the example of the person who should have had their best interests at heart.

Similarly, even arrest did little to dissuade the defendant from engaging in criminal activity.   Almost immediately after his arrest, the defendant sought to destroy evidence.   Later, the defendant and Mr. Huggett discussed the potential murder of a witness.   And, even on the eve of trial, the defendant was attempting to pass messages to a witness in an apparent effort to affect her testimony.

Most importantly, the defendant's actions in this case reflect a callous disregard

for the safety and well-being of others.   When informed that the pills he was distributing were killing people, the defendant showed, at best, ambivalence.   The defendant knew how deadly his counterfeit pills were and that they appeared to be far less potent. Nevertheless, the defendant continued to import and sell thousands of these pills to satisfy his own greed.   The evidence established, beyond a reasonable doubt, that the defendant caused J.E.'s death.   The evidence also shows that it is more likely than not that the defendant caused several additional deaths.   These actions have lifelong consequences to J.E.'s family, and the many other families affected by the defendant. The defendant's punishment should have the same duration.

Taking into account all of the 3553(a) factors, a life sentence is the only sentence that is sufficient, but not greater than necessary, to satisfy the statutory purposes of sentencing.   Because of the length of incarceration and the need for restitution in this matter, the government does not recommend a fine.   Finally, should the defendant be released from incarceration, the government recommends a lifetime of supervised release, and notes that the Court must impose a period of at least five years.

## IV.    RESTITUTION

Under Title 18, United States Code, Section 3663, the defendant owes restitution to any victim of his crimes.   This applies to "any person directly harmed by the defendant's criminal conduct in the course of [a charged conspiracy]."   18 U.S.C. § 3663(a)(2).   And, restitution includes the cost of any necessary funeral or related services associated with the death of a victim.   18 U.S.C. § 3663(b)(3).

Here, the record so far reflects restitution in the amount of $18,302.96 related to necessary funeral and related services associated with J.E.'s death.   The government requests this amount be ordered as restitution, joint and several with Mr. Huggett, Mr. Green, and any other defendant convicted of a charge related to J.E.'s death.

In addition, while not specifically charged like J.E., several other individuals died as result of the defendant's criminal conduct in furtherance of the conspiracy.   The defendant is accountable for funeral expenses associated with the deaths of these other individuals as well.   The government is in the process of seeking restitution figures associated with those individuals, as well as seeking their family's input regarding sentencing.

WHEREFORE, the government requests that the Court sentence the defendant to life imprisonment, followed by a lifetime of supervised release.   The government also requests that the Court order restitution as permitted by law.

Respectfully submitted this 20th day of May, 2021.

MATTHEW T. KIRSCH
Acting United States Attorney

| By: *s/ Jeremy Chaffin* | By: *s/ Jaime Pena* |
|---|---|
| JEREMY CHAFFIN | JAIME PENA |
| Assistant United States Attorney | Special Assistant United States Attorney |
| United States Attorney's Office | 1801 California St., Suite 1600 |
| 205 North 4th Street, Suite 400 | Denver, CO 80202 |
| Grand Junction, CO 81501 | Telephone: (303) 454-0100 |
| Tel: (970) 257-7113 | FAX: (303) 454-0400 |
| Fax: (970) 248-3630 | E-mail: jaime.a.pena@usdoj.gov |
| E-mail: jeremy.chaffin@usdoj.gov | Attorney for the Government |
| Attorney for the Government | |

24

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on this 20th day of May, 2021, I electronically filed the foregoing **GOVERNMENT'S SENTENCING STATEMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties of record.

<u>s/ Cosandra Foster</u>
COSANDRA FOSTER
Paralegal Specialist
U.S. Attorney's Office
205 N. 4th Street, Suite 400
Grand Junction, CO 81501
Telephone (970) 241-3843
Fax (970) 248-3630
E-mail: <u>cosandra.foster@usdoj.gov</u>