**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Criminal Action No. 18-cr-00381-CMA-GPG-01

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.  BRUCE HOLDER

     Defendant.

---

**ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL OR IN THE
ALTERNATIVE MOTION FOR A NEW TRIAL**

---

This matter is before the Court on Defendant Bruce Holder's Motion for

Judgment of Acquittal or in the Alternative Motion for a New Trial. (Doc. # 633.) Therein,

Mr. Holder moves for a judgment of acquittal on Counts One and Two of the Second

Superseding Indictment or, in the alternative, for a new trial. The Government filed a

Response in opposition to the Motion. (Doc. # 640.) For the following reasons, the

Motion is denied.

## I.    <u>BACKGROUND</u>

The Second Superseding Indictment, filed on August 19, 2019, charged Mr.

Holder with six counts of conspiracy to distribute and possess with intent to distribute a

controlled substance and/or counterfeit substance containing fentanyl; distribution of a

controlled substance containing fentanyl resulting in the death of J.E. and serious bodily

injury to Z.G.; and distribution of a counterfeit controlled substance that bore an identifying mark that falsely purported the substance to be the product of Mallinckrodt, Inc. (Doc. # 183.) In October of 2020, the Government moved to dismiss Counts Five and Six, which this Court granted. (Doc. ## 463, 464.)

As pertinent here, on April 5, 2021, this case proceeded to trial on Counts One through Four. Mr. Holder was tried by a jury and convicted of conspiracy to distribute and possess with intent to distribute fentanyl and a counterfeit substance (Count One), distribution of fentanyl (Counts Two and Three), and distribution and possession with intent to distribute a counterfeit substance (Count Four). (Doc. # 573.)

The jury also made special findings with regarding to statutory sentence enhancers applicable to the charges. For Count One, the jury concluded that the amount of controlled substances attributable to Mr. Holder's own actions and the reasonably foreseeable actions of his co-conspirators in furtherance of the conspiracy was at least 400 grams or more of fentanyl. (*Id.*) For Count Two, the jury found that use of fentanyl distributed by Mr. Holder resulted in the death of an individual, J.E. (*Id.*) Finally, the jury concluded that there was reasonable doubt regarding whether use of fentanyl distributed by Mr. Holder resulted in serious bodily injury to a separate person. (*Id.*)

During trial, the defense moved for judgment of acquittal pursuant Fed. R. Crim. P. 29, which the Court denied. Upon conviction, Mr. Holder renews his Rule 29 Motion and moves, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33.

## II.   <u>**LEGAL STANDARDS**</u>

Fed. R. Crim. P. 29 permits a defendant to move for a judgment of acquittal, or renew such a motion, if the jury has returned a guilty verdict. In evaluating whether there was sufficient evidence to support a conviction, the Court must view all evidence in the light most favorable to the Government and may grant a motion for judgment of acquittal only if no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *United States v. Gordon*, 710 F.3d 1124, 1141 (10th Cir. 2013) (quoting *United States v. Irvin,* 682 F.3d 1254, 1266 (10th Cir. 2012)). "In conducting this inquiry, the Court may not weigh conflicting evidence" and must consider "the entire record, including both direct and circumstantial evidence, together with the reasonable inferences to be drawn from it." *Id.* (citations omitted). The evidence supporting the conviction must be "substantial" and "do more than raise a suspicion of guilt," but "need not conclusively exclude every other reasonable hypothesis" and "need not negate all possibilities except guilt." *United States v. Vallejos,* 421 F.3d 1119, 1122 (10th Cir. 2005).

The standard for granting a new trial in a criminal case is set forth in Fed. R. Crim. P. 33, which provides that a new trial may be granted "if the interest of justice so requires." Nevertheless, "a motion for a new trial is not regarded with favor and is only issued with great caution." *United States v. Herrera,* 481 F.3d 1266, 1269–70 (10th Cir. 2007).

III.   **DISCUSSION**

**A.   MOTION FOR JUDGMENT OF ACQUITTAL**

In his Motion, Mr. Holder challenges the jury's guilty verdicts on Counts One and Two of the Second Superseding Indictment only. Viewing all evidence in the light most favorable to the Government, the Court finds that a rational trier of fact could have found Mr. Holder guilty of Counts One and Two beyond a reasonable doubt. *Gordon*, 710 F.3d at 1141. Accordingly, Mr. Holder's Motion is denied to the extent it seeks a judgment of acquittal under Rule 29.

1.   Count One

Mr. Holder makes two arguments in furtherance of his Rule 29 Motion as to Count One. First, he argues that a prejudicial variance occurred because the evidence established that Marie Matos committed independent drug crimes as part of a second, separate conspiracy after Mr. Holder was taken into custody. Second, he argues there was insufficient evidence to support the jury's special findings regarding the statutory sentence enhancer applicable to Count One—i.e., that Mr. Holder possessed and/or distributed 400 grams or more of fentanyl. The Court first concludes that a rational trier of fact could have found each element of Count One satisfied beyond a reasonable doubt before turning to Mr. Holder's arguments.

a.   *Elements of Count One*

Count One of the Second Superseding Indictment charged Mr. Holder with conspiracy to distribute or possess with intent to distribute a counterfeit controlled substance containing fentanyl between in or about June 2017, and in or about January

2019, within the State and District of Colorado and elsewhere. To convict Mr. Holder on Count One, the jury was required to find that: (1) two or more persons agreed to violate the federal drug laws by either (a) distributing or possessing with intent to distribute fentanyl, or (b) distributing or possessing with intent to distribute a counterfeit substance; (2) Mr. Holder knew the essential objective of the conspiracy; (3) Mr. Holder knowingly and voluntarily involved himself in the conspiracy; and (4) there was interdependence among the members of the conspiracy.

### i.   *First element*

With respect to the first element, numerous witnesses testified they agreed to sell small, round, blue pills containing fentanyl (marked with a letter M on one side and the number 30 on the other) obtained from Mr. Holder during the timeframe charged. Those witnesses included Marie Matos, Christopher Huggett, Lexus Holder, Tyrese Holder, and Whitney Garcia. The Government also introduced evidence that Mr. Holder and other members of the conspiracy knew the substance was fentanyl and was counterfeit. For example, Mr. Huggett and Ms. Matos testified that they learned from Mr. Holder that the blue pills contained fentanyl and were stronger than oxycodone 30 milligram pills.

### ii.   *Second Element*

With respect to the second element, numerous witnesses testified that Mr. Holder knew both objectives of the conspiracy charged in the Second Superseding Indictment. Mr. Huggett and Ms. Matos testified that Mr. Holder knew that the pills contained fentanyl and were stronger than oxycodone pills. Crystal Brickey and Glenn Brickey testified that Mr. Holder told them the pills contained fentanyl. Notably, Ms. Matos

testified that Mr. Holder continued to sell the blue pills after he discovered they contained fentanyl and had caused the overdose of at least one person.

###### iii.      *Third Element*

With respect to the third element, the testimony of various witnesses and several exhibits established that Mr. Holder knowingly and voluntarily involved himself in the conspiracy. Ms. Matos testified that Mr. Holder created the conspiracy. Specifically, she testified that getting the blue pills was his idea, that the supplier of the pills located in Puerto Peñasco, Mexico (nicknamed "Chon") was Mr. Holder's friend, and that Mr. Holder said "he was tired of playing ATM to his kids, and that if they wanted money from him they were going to have to work for it" by selling blue pills.[1] Ms. Matos and Lexus Holder both testified that Mr. Holder was the boss in the conspiracy. Ms. Matos, Mr. Huggett, Lexus Holder, and Tyrese Holder all testified that Mr. Holder would set the

---

[1] Ms. Matos also testified at length as to Mr. Holder's role in acquiring and distributing the pills. She testified as follows:

- Mr. Holder made the first deposit of $3,000 in Chon's bank account and made "the majority" of the deposits into Chon's account thereafter;

- Mr. Holder came up with the plan for Ms. Matos to travel to Mexico to pick up blue pills the first time because she did not have a criminal record and could, therefore, cross the border between the United States and Mexico more easily;

- Mr. Holder and Ms. Matos went on at least seven trips to Mexico together, including four times they "made it a family trip" and three times where they went as a business trip "just to get another load";

- Mr. Holder would exit the car at the border crossing in Lukeville, Arizona, because he had a criminal record and remaining in the car would increase the chances of it being searched; and

- Mr. Holder would routinely unload the pills from the dashboard of the car about two weeks after the return trip from Puerto Peñasco to Colorado. Once he unloaded the pills, he would "take them into the house, prepackage them, would make some phone calls[,] and some people would show up to pick them up."

price for the blue pills. Further, the Government introduced text messages between Chon and Mr. Holder, sent between February and July of 2018, in which Mr. Holder discussed running out of blue pills, paying Chon, and what quality of pills he wanted to receive.

### iv.     *Fourth Element*

Finally, with respect to the fourth element, interdependence, the testimony of several witnesses established that the co-conspirators intended to act for their shared mutual benefit and that Mr. Holder's actions constituted essential and integral steps toward the realization of their shared criminal purpose. Mr. Huggett, Tyrese Holder, and Ms. Matos all testified that they would take care of their co-conspirators' customers when that co-conspirator was out of town or was otherwise unavailable.[2] Moreover, many of Mr. Holder's actions constituted essential and integral steps toward realization of the conspiracy's purpose. Evidence previously described established that Mr. Holder came up with the idea to sell the blue pills, deposited the cash for the pills into the supplier's account, personally went on several trips to Mexico to pick up the pills, brought family members into the fold to distribute the pills, including his daughter, son, and stepdaughter; set the price for the pills, and restocked the supplies for Ms. Garcia, Mr. Huggett, Tyrese Holder, and Lexus Holder when they were low on pills.

---

[2] For example, Mr. Huggett and Tyrese Holder testified that they would take care of Mr. Holder's customers by selling them pills when Mr. Holder was out of town. Similarly, Mr. Brickey testified that he purchased pills from Ms. Matos and Tyrese Holder when Mr. Holder was unavailable. Ms. Matos testified that Mr. Green came by her shared residence with Mr. Holder at least twice because he wanted to purchase more pills and Mr. Huggett was unavailable.

For these reasons, the Court is satisfied that, when viewing the evidence in the light most favorable to the Government, a rational jury could have found all elements of Count One satisfied beyond a reasonable doubt.

        b.    *Variance*

Mr. Holder argues that his conviction on Count One must be overturned because a prejudicial variance occurred. Specifically, Mr. Holder argues that the evidence at trial established a separate, independent conspiracy involving Ms. Matos and Chon and that Ms. Matos's receipt of a shipment of blue pills in January of 2019 could not have been reasonably foreseeable to Mr. Holder because he was already in custody. The Court finds that a variance did not occur in this case.

"A variance arises when an indictment charges a single conspiracy but the evidence presented at trial proves only the existence of multiple conspiracies." *United States v. Carnagie*, 533 F.3d 1231, 1237 (10th Cir. 2008) (citation omitted). However, not all variances are fatal. *Id.* at 1240. A variance can only support a motion for judgment of acquittal "if it is prejudicial—that is, if it denies the accused his right to a fair trial." *United States v. Sanchez*, 979 F.3d 1256, 1260 (10th Cir. 2020). "In the conspiracy context, prejudice exists if the defendant lacked sufficient notice of the need to defend against smaller conspiracies, or if the jury imputed to the defendant evidence of guilt offered against coconspirators who were involved in other conspiracies." *Id.* at 126–61 (internal quotation marks and brackets omitted). It is the defendant's burden to establish a variance occurred and, if so, that it was fatal. *Id.* at 1261.

Each member of a conspiracy is legally responsible for the reasonably foreseeable crimes of his fellow conspirators committed in furtherance of the conspiracy until the conspiracy accomplishes its goals or that conspirator withdraws. *United States v. Randall*, 661 F.3d 1291, 1294 (10th Cir. 2011); *United States v. Wardell*, 591 F.3d 1279, 1291 (10th Cir. 2009). "A single conspiracy does not splinter into multiple conspiracies because members come and go." *United States v. Fishman*, 645 F.3d 1175, 1190 (10th Cir. 2011). Nor does a single conspiracy become multiple conspiracies merely because there is a lapse in time between transactions. *See United States v. Williamson*, 53 F.3d 1500, 1514 (10th Cir. 1995) (holding that a seven-month hiatus did not sever a single conspiracy into two separate conspiracies where "operations resumed with the same participants, the same conspiratorial objective and the same course of conduct"). Indeed, "a conspiracy does not end simply because one conspirator has been arrested, and a conspirator's arrest or incarceration by itself is insufficient to constitute his withdrawal from the conspiracy." *United States v. Alcorta*, 853 F.3d 1123, 1139 (10th Cir. 2017) (internal quotation marks omitted).

As this Court concluded at trial, Mr. Holder cannot argue that he withdrew from the charged conspiracy because there was no evidence that he took any affirmative action to withdraw, either by reporting the conspiracy to the authorities or by communicating his intentions to his co-conspirators. *United States v. Randall*, 661 F.3d 1291, 1294 (10th Cir. 2011) (quoting *United States v. Powell*, 982 F.2d 1422, 1435 (10th Cir. 1992)); *see also United States v. Hughes*, 191 F.3d 1317, 1321 (10th Cir. 1999) ("Mere cessation of one's participation in a conspiracy is insufficient to

demonstrate withdrawal."). To the contrary, the evidence at trial showed that Mr. Holder continued to act in furtherance of the conspiracy after he was arrested by attempting to shield the conspiracy's activities from law enforcement.[3]

Finding no success in arguing he withdrew from the conspiracy, Mr. Holder now asserts that, because he could not personally participate in the transactions, a new conspiracy was created after he was taken into custody. As discussed above, the evidence at trial established a conspiracy between Mr. Holder, his friends and family, and his supplier, Chon, to import large quantities of counterfeit pills containing fentanyl from Mexico and to distribute those pills for profit in the Grand Junction, Colorado area. A reasonable jury could find beyond a reasonable doubt that Ms. Matos's receipt of another shipment of blue pills from Chon following Mr. Holder's arrest was both reasonably foreseeable to Mr. Holder and was committed in furtherance of the single, charged conspiracy. Accordingly, the Court rejects Mr. Holder's argument that a variance occurred because the jury heard that Ms. Matos received a shipment of blue pills approximately five months after Mr. Holder's arrest.[4]

---

[3] Ms. Matos testified that Mr. Holder called her from jail and instructed her to destroy evidence of the conspiracy accessible through his iTunes account, including pictures, text messages, and phone calls between Mr. Holder and Chon regarding the pills. Additionally, Mr. Huggett testified that he and Mr. Holder had conversations while in custody concerning how they would both benefit from a witness being killed so that he could not incriminate them.

[4] The Court also agrees with the Government that Mr. Holder's conduct up until his arrest establishes his guilt beyond a reasonable doubt on each element of the conspiracy charged in Count One.

c.    *Sentence enhancer – quantity*

Finally, Mr. Holder argues there was insufficient evidence to support the jury's special findings regarding the statutory sentence enhancer applicable to Count One—i.e., that Mr. Holder possessed and/or distributed 400 grams or more of fentanyl. The Court disagrees, finding that the testimony of several witnesses established that at least 400 grams of a substance containing a detectable amount of fentanyl are attributable to the acts of Mr. Holder and/or his co-conspirators' reasonably foreseeable acts in furtherance of the conspiracy.

Forensic analysts Sara Manney and Danielle Farrell testified that each of the blue pills tested in this case weighed roughly one tenth of a gram and that 400 grams is equivalent to roughly 4,000 blue pills. The Government introduced into evidence text messages between Mr. Holder and Chon in February of 2018, in which Mr. Holder informs Chon that he is almost out of "blues" and Chon asks Mr. Holder how that could be the case because he had recently given Mr. Holder 4,000 pills.

Additionally, Ms. Matos testified that on every trip to Mexico except the first trip, they would pick up two large bags containing smaller bags of blue pills, and that each load consisted of approximately 2,000 pills. She further estimated that, throughout 2017, they consistently picked up about 2,000 pills from Puerto Peñasco every two weeks; put differently, she testified that they received 52,000 pills that year.

Similarly, Mr. Huggett testified that he drove from Mexico to Colorado with Mr. Holder in March of 2018, and that Mr. Holder showed him a package of blue pills. Mr. Huggett testified that the package was a large, seal-a-meal food storage bag, which

contained multiple, smaller packages of blue pills. He further testified that Mr. Holder told him each package was supposed to contain 1,000 blue pills for easier counting. Tyrese Holder also testified that there were about 1,000 blue pills per package.

Moreover, Mr. Brickey testified that he took five blue pills per day for at least a year, and that he got those pills from Mr. Holder and his co-conspirators. Five pills per day multiplied by 365 days would yield 1,825 pills consumed by Mr. Brickey alone. Separately, Ms. Brickey testified that Mr. Holder sold her pills at least four times a week between late 2016 or early 2017 and the date of his arrest in August 2018, and that Mr. Holder would sell her a minimum of five pills at a time.[5]

Finally, Officer Blake McClellan testified that a potato chip bag containing two packages of small, blue pills, obtained in the transaction that post-dated Mr. Holder's arrest, was discovered in Ms. Matos's car. Forensic analyst Danielle Farrell testified that the potato chip bag contained 1,968 pills. Even assuming the jury did not find beyond a reasonable doubt that Mr. Holder was responsible for that particular shipment of pills, this evidence bolsters the testimony of Ms. Matos, Mr. Huggett, and Tyrese Holder concerning the number of pills per package contained in previous shipments.

Accordingly, the Court finds that the testimony of multiple witnesses concerning pill amounts and the frequency of trips to Mexico could lead a rational trier of fact to conclude beyond a reasonable doubt that at least 400 grams of fentanyl are attributable to Mr. Holder's acts and the reasonably foreseeable acts of his co-conspirators.

---

[5] Text message communications between Ms. Brickey and Mr. Holder, and between Mr. Holder and Ms. Matos, corroborated Ms. Brickey's testimony concerning the five-pill minimum.

Thus, the Court is satisfied that, when viewing the evidence in the light most favorable to the Government, a rational jury could conclude that the Government proved beyond a reasonable doubt all elements of Count 1, as well as the applicable sentence enhancer. Mr. Holder's Rule 29 Motion is denied as to Count One.

2.    Count Two

Next, Mr. Holder argues that the Government failed to establish causation under Count Two because the evidence presented at trial did not establish beyond a reasonable doubt that, but for fentanyl use, J.E. would not have died. Mr. Holder also argues, in one sentence, that "no one could testify where the fentanyl found in his blood came from with certainty . . . because no one witnessed J.E. during the approximate 48 hours before his death and no one actually saw him take any fentanyl." (Doc. # 633 at 14.) Thus, Mr. Holder objects not to the elements of Count Two but to the jury's special findings as to the applicable statutory sentence enhancer—i.e., that use of fentanyl distributed by Mr. Holder resulted in the death of J.E. The Court rejects both arguments.

a.    *Whether fentanyl was a but-for cause of J.E.'s death*

As relevant here, the Supreme Court has held that a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless use of the drug distributed by the defendant is a but-for cause—put differently, an independently sufficient cause—of the victim's death. *Burrage v. United States*, 571 U.S. 204, 218–19 (2014). With respect to the sentence enhancer applicable to Count Two, the jury in this case was instructed that,

> [i]n order to establish that death resulted from use of the fentanyl, the Government must prove that a person died as a consequence of his or her

13

use of fentanyl distributed by Mr. Holder on or about the dates alleged in the indictment. This means that the Government must prove beyond a reasonable doubt that but for the use of the fentanyl, the person would not have died.

(Doc. # 571 at 24–25.)

The Court finds that a rational jury could conclude beyond a reasonable doubt that fentanyl was a but-for cause of J.E.'s death. Chemist Michael Lamb testified that he has seen deaths from fentanyl levels as low as 3 or 4 nanograms per milliliter, and his toxicology analysis of J.E.'s post-mortem blood sample revealed 18 nanograms of fentanyl per milliliter. John Carver, a forensic pathologist from the Jefferson County Coroner's Office, testified that J.E. had fentanyl in his blood stream and that, but for ingesting that fentanyl, he would not have died. Mr. Holder's own expert witness, forensic pathologist Amy Gruszecki, testified that "fentanyl was one of the causes of [J.E.'s] death" and that, even if she had more information about the contributory effects of other drugs, she would still consider fentanyl a cause of J.E.'s death:

> Q.   If we had the answers then you might change your opinion about what the cause of death was?
>
> A.   If there is other information to be considered, then, yes, it would allow us to change our opinion or amend it in some way.
>
> Q.   And that could include the fact -- that could include an opinion that fentanyl was not the cause of death?
>
> A.   Hypothetically, yes.
>
> Q.   Thank you?
>
> A.   Well, I would still consider [it] a cause of death. It would still be involved in his cause of death, 18 nanograms per milliliter is a very large dose of fentanyl so fentanyl certainly was a cause of death but whether any other drugs were also involved is unclear.

Based on the testimony of Michael Lamb, John Carver, and Amy Gruszecki, there was ample evidence from which a rational jury could conclude that fentanyl was a but-for cause of J.E.'s death.

> b.   Whether the fentanyl was distributed by Mr. Holder

Further, the Court finds that a rational jury could conclude beyond a reasonable doubt that the fentanyl ingested by J.E. was attributable to Mr. Holder.

The jury heard testimony that a spoon with burnt blue markings, two blue pills, and a plastic container with a melted blue pill were found in J.E.'s room after his death. Stephen Brumbaugh testified that he tested one of the round, blue pills found in J.E.'s room, which bore the markings of an M in a box on one side and the number 30 on the reverse side, and that pill contained fentanyl. He further testified that neither the irregular shaped, blue pill nor the tan powder found in J.E.'s room contained fentanyl. Testimony from Mr. Huggett and Mr. Green, as well as text message communications involving Mr. Huggett, Mr. Green, and J.E., established that J.E. bought those round, blue pills from Mr. Green, who bought them from Mr. Huggett, who, in turn, got them from Mr. Holder.[6]

Accordingly, for these reasons, the Court is satisfied that, when viewing the evidence in the light most favorable to the Government, a rational jury could conclude

---

[6] Mr. Huggett testified that he got the blue fentanyl pills he sold to Mr. Green on December 26, 2017, from Mr. Holder. Mr. Green testified that he purchased 12 blue pills from Mr. Huggett for $300 on December 26, 2017, at the Tumbleweed dispensary. Mr. Green further testified that he sold 10 of those blue pills to J.E. and delivered them to him inside J.E.'s paycheck. Mr. Green did so at J.E.'s request, sent by text message, so that J.E.'s roommates would not find out about the pills. Mr. Green stated that he sold J.E. the pills that ended up taking his life.

that the Government proved beyond a reasonable doubt that J.E. died as a consequence of his use of fentanyl distributed by Mr. Holder. The Court denies Mr. Holder's Rule 29 Motion as to Count Two.

## B.   MOTION FOR NEW TRIAL

Mr. Holder argues that fundamental fairness and the interests of justice warrant a new trial under Rule 33 for the following reasons: (1) the Government's witnesses had significant credibility problems and gave conflicting testimony; (2) a prejudicial variance occurred, as discussed above; and (3) COVID-19 protocols implemented during the trial violated Mr. Holder's rights to due process, a fair trial, confrontation, and equal protection.

### 1.   Testimony at Trial

"In deciding a motion for new trial, the court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred." *See United States v. Evans*, 42 F.3d 586, 593–94 (10th Cir. 1994). However, "the power to grant a new trial on this ground should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict." *Id.* (quoting 3 C. Wright, *Federal Practice & Procedure,* § 553, at 248 (2d ed. 1982)).

Mr. Holder asserts that the testimony of Ms. Matos, Mr. Huggett, and Special Agent Kevin Doheny was unreliable and not credible. However, the Court found the witnesses against Mr. Holder to be credible and found that the testimony of Ms. Matos and Mr. Huggett in particular was consistent with the testimony of other witnesses in

many, material ways.[7] The Court agrees with the Government that minor inconsistencies in witness testimony do not render the jury verdicts unreliable. Upon consideration of the record as a whole, the Court finds that the evidence at trial does not clearly weigh against the jury verdicts and, therefore, denies Mr. Holder's Rule 33 Motion on this basis. *See United States v. Evans*, 42 F.3d 586, 593–94 (10th Cir. 1994) (holding district court's grant of a new trial was abuse of discretion where the evidence did not weigh heavily against the jury's verdicts).

2.    Variance

Having concluded herein that a variance did not occur in this case, the Court denies Mr. Holder's Rule 33 Motion to the extent it argues that a prejudicial variance requires a new trial.

3.    COVID-19 Protocols

Finally, Mr. Holder moves for a new trial on the basis of COVID-19 protocols. Mr. Holder's jury trial in this case was conducted as a pilot trial during the COVID-19 pandemic. It, thus, involved numerous safety protocols to mitigate the risk of the spread of COVID-19. For the following reasons, the Court rejects Mr. Holder's assertion that the safety protocols implemented in this case require a new trial.

---

[7] For example, Ms. Matos, Mr. Huggett, Lexus Holder, and Tyrese Holder all testified that Mr. Holder would set the price for the blue pills. Ms. Matos and Lexus Holder both testified that Mr. Holder was the boss of the conspiracy. Ms. Matos, Mr. Huggett, and Tyrese Holder all testified that Mr. Holder would store the blue pills in his coffee table and his bedroom closet. Further, Ms. Matos, Mr. Huggett, and Tyrese Holder all testified that Mr. Holder brought them on trips to Mexico, after which they saw Mr. Holder get out of the car and walk across the border from Mexico into the United States.

First, the Court agrees with the Government that Mr. Holder has waived all claims of prejudice stemming from the Court's COVID-19 protocols. This Court gave Mr. Holder the opportunity to push his trial back if he did not wish to comply with the Court's COVID-19 protocols. The Court gave Mr. Holder ample notice of what those protocols would entail, including masks worn by all individuals in the courtroom and seating jurors in the gallery to maintain 6-foot distance between individuals. Further, the Court gave Mr. Holder the exclusive right to choose whether witnesses would testify in the courtroom with a mask on or from an adjoining room, without a mask, via video teleconference. Nevertheless, Mr. Holder invoked his speedy trial rights, informed the Court that he wished to proceed to trial, objected to the Court's COVID-19 protocols on the record, and chose to have witnesses testify in person while wearing masks.

Even assuming Mr. Holder has not waived his arguments to COVID-19 protocols, his arguments concerning the mask mandate, jury protocols, and public access to the trial all fail on the merits.

a.    *Masks*

Mr. Holder encourages the Court to find that having witnesses testify in masks violated his rights to confrontation, a fair trial, and due process. Notably, Mr. Holder provides no citation to authority for this argument.

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. . . ." U.S. Const. amend. VI. However, this right is not absolute; "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face

confrontation at trial" when it is "necessary to further an important public policy" and "the reliability of the testimony is otherwise assured." *Maryland v. Craig*, 497 U.S. 836, 850 (1990).

In this case, the mask requirement was "necessary to further an important public policy: ensuring the safety of everyone in the courtroom in the midst of a unique global pandemic." *United States v. Crittenden*, 2020 WL 4917733, at *6 (M.D. Ga. 2020). Further, the reliability of witness testimony was otherwise assured; jurors were able to observe how witnesses moved, spoke, hesitated, and even cried, and the defense was able to cross-examine witnesses without hinderance. The "Confrontation Clause does not require that the jury be able to see every language of the body[,]" and the Court's mask mandate in this case did not violate Mr. Holder's right to confrontation. *See Crittenden*, 2020 WL 4917733, at *7 (citing *Morales v. Artuz*, 281 F.3d 55, 56, 60–61 (2d Cir. 2002) (finding that permitting a witness to testify while wearing dark sunglasses was not contrary to clearly established federal law because it "resulted in only a minimal impairment of the jurors' opportunity to assess her credibility")).

       b.    *Jurors*

Next, the Court addresses Mr. Holder's argument that he was prejudiced by the social distancing of jurors, which resulted in some jurors watching a video recording of opening statements and sitting in the gallery during the trial.

First, the Court notes that Mr. Holder has not identified what, if any, prejudice resulted from any juror watching a recorded opening statement or sitting in the gallery during trial. Instead, Mr. Holder's arguments are premised on pure speculation. *See*

(Doc. # 633 at 16) (arguing the jurors "could not have been able to really see the witness on the stand" and "their hearing must have been impacted"). In actuality, the Court provided opportunities for jurors to raise any difficulties with sight or hearing before and during trial and was prepared to address any such difficulties. However, assuming that a juror had some difficulty seeing or hearing during the trial, "[m]any jurors have somewhat less than perfect hearing or vision, or have other limitations on their abilities to assimilate or evaluate testimony and evidence." *United States v. Dempsey*, 830 F.2d 1084, 1088 (10th Cir. 1987). "A defendant is not entitled to a perfect trial, but only a fair one." *Id.* Under these circumstances, the spacing of the jurors did not deprive Mr. Holder of a fair trial.

      *c.*    *Public trial*

Lastly, the Court rejects Mr. Holder's argument that he was not afforded a public trial because members of the public were generally limited to observing the proceedings by telephone and were not permitted to enter the courtroom.

The Sixth Amendment guarantees every criminal defendant a "speedy and public trial." U.S. Const. Amend. VI. "Although the right to an open trial is not absolute, that right will only rarely give way to other interests." *Davis v. Reynolds*, 890 F.2d 1105, 1109 (10th Cir. 1989) (citing *Waller v. Georgia*, 467 U.S. 39 (1984)).

In this case, allowing limited members of the public to socially distance from jurors in the gallery, while permitting other members of the public to observe the proceedings by phone, constituted a partial closure of the courtroom. In the Tenth Circuit, a partial closure of the courtroom "need only be supported by a substantial

interest, rather than a compelling one." *United States v. Galloway*, 937 F.2d 542, 546 (10th Cir. 1991); *see also Davis v. Reynolds*, 890 F.2d 1105, 1109 (10th Cir. 1989). The partial closure of the courtroom during Mr. Holder's trial was supported by, at the very least, a substantial interest—i.e., the protection of the health and safety of trial participants during the COVID-19 pandemic.

Further, the Court's partial closure of the courtroom was narrowly tailored to comply with CDC guidelines and General Orders issued by Chief Judge Brimmer, which limited court operations within the District of Colorado at the time of trial. *See, e.g.,* General Order 2021-2: COURT OPERATIONS DURING THE COVID-19 PANDEMIC (D. Colo. January 14, 2021) (Brimmer, C.J.). As such, the Court's restrictions were no broader than necessary to protect the health and safety of trial participants within the confines of the courtroom.[8]

For the foregoing reasons, the Court finds that Mr. Holder has failed to establish that his constitutional rights to a fair trial, an impartial jury, or due process were violated by the Court's COVID-19 protocols. His Rule 33 Motion is denied on this basis.

---

[8] Additionally, the Court notes that Mr. Holder could have, but did not, request that any particular individual be allowed to observe his trial in person. Upon the Government's request, the Court did permit family members of the victim in this case to utilize the remaining available space in the gallery. *See* 18 U.S.C. § 3771(a)(3) (providing a crime victim has the right not to be excluded from any public court proceeding involving the crime of the accused). Mr. Holder had notice of that seating arrangement and did not object to it during the proceedings. The Court agrees with the Government that Mr. Holder should not be allowed to argue for the first time, after conviction, that permitting the family of the victim to sit in the gallery constituted grounds for a new trial.

## IV.   <u>CONCLUSION</u>

Defendant Bruce Holder's Motion for Judgment of Acquittal or in the Alternative

Motion for a New Trial (Doc. # 633) is DENIED.

DATED:  September 27, 2021

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge